IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **KRISHA DANIELLE PRIM,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 7:14-cv-135 |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Krisha Danielle Prim ("Prim") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Specifically, Prim alleges that the ALJ erred by failing to adopt limitations assessed by her treating urologist and a consultative examiner. I conclude that substantial evidence supports the ALJ's decision as a whole. Accordingly, I **RECOMMEND DENYING** Prim's Motion for Summary Judgment (Dkt. No. 18), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 20.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Prim failed to demonstrate that she was disabled under the Act.[1] "Substantial evidence is such relevant evidence as a reasonable mind might

---

[1] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which

1

accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Prim filed for SSI on March 10, 2009, claiming that her disability began on January 1, 2007. R. 222. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 72–105. On August 21, 2012, ALJ Steven De Monbreum held a hearing to consider Prim's disability claim. R. 36–71. Prim was represented by an attorney at the hearing, which included testimony from vocational expert Barry Hensley. Id.

On October 9, 2012, the ALJ entered his decision analyzing Prim's claim under the familiar five-step process, and denying Prim's claim for benefits.[2] R. 13–26. The ALJ found that Prim suffered from the severe impairments of interstitial cystitis ("IC"),[3] history of non-epileptic seizures, obstructive sleep apnea, migraines, polycystic ovarian syndrome,

---

affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience. See 42 U.S.C. §1382c(a)(3)(B).

[2] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[3] Interstitial cystitis is a chronic condition in which you experience bladder pressure, bladder pain and sometimes pelvic pain, ranging from mild discomfort to severe pain. See http://www.mayoclinic.org/diseases-conditions/interstitial-cystitis/basics/definition/con-20022439.

2

fibromyalgia, sarcoidosis, major depressive disorder and generalized anxiety disorder. R. 15. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 15–16. The ALJ determined that Prim retained the residual functional capacity ("RFC") to perform light work, but is limited to no more than occasional kneeling, crawling, crouching, stooping, balancing, or climbing ramps and stairs; can never climb ladders, ropes and scaffolds; and should have no concentrated exposure to hazards. R. 17. The ALJ further found that Prim is limited to simple, routine, easy-to-learn unskilled work activity, should not interact with the public and should have only superficial interaction with coworkers and supervisors. R. 17.

The ALJ determined that Prim had no past relevant work, but that given the above RFC, she could perform jobs that exist in significant numbers in the national economy such as non-postal mail clerk, production inspector and hand packer. R. 25. Thus, the ALJ concluded that she was not disabled. R. 26. On January 27, 2014, the Appeals Council denied Prim's request for review (R. 1–4), and this appeal followed.

## ANALYSIS

Prim argues that the ALJ erred by (1) failing to include all of Prim's mental limitations in the hypothetical given to the vocational expert; and (2) rejecting Prim's treating urologist's opinion that she would need a bathroom break once an hour.

**Mental Limitations**

Prim argues that the ALJ erred by not including a restriction that she is markedly limited in her ability to work with or near others without being distracted by them in the hypothetical question to the vocational expert. The Commissioner argues that the ALJ's decision not to include that limitation is irrelevant, because the vocational expert testified that jobs would exist

3

in the competitive market even with the additional limitation.[4] I find that the RFC assessed by the ALJ is supported by substantial evidence and the hypothetical relied upon by the ALJ appropriately included all of the limitations included in Prim's RFC. Thus, I need not address the Commissioner assertion that sufficient jobs exist in the competitive market if the limitation is included.

Prim was born in 1989 and was only 23 years old on the date of the ALJ's decision. R. 228. She has a GED and no past work experience. R. 240–41. Prim testified at the administrative hearing that she suffers from symptoms of depression and anxiety. Prim also testified that she cannot be around other people and has problems with authority figures. R. 41. The record reflects that Prim complained of mild depressive symptoms to her treating physicians in early 2010, and was prescribed Zoloft and Klonopin. R. 540–42. In March 2010, Prim reported feeling stressed daily and her medications were not helping her symptoms. R. 797–98. Prim reported mild depressive and intrusive thought/sleep issues, and stated that she just "stresses herself out too much." R. 798. Prim was prescribed Cymbalta for better anxiety control. R. 800. On March 15, 2010, Prim underwent a counseling intake interview with Bert Graham, M.S., and reported depressive episodes and manic episodes with racing thoughts. R. 828–30. Prim denied any problem with crowds or being in public and said she regularly volunteered at her daughter's school. R. 828. Graham diagnosed Prim with bipolar disorder, and rated her Global Assessment of Functioning ("GAF") score at 65.[5] R. 830. Graham noted that Prim

---

[4] At step five, the agency has the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform given her RFC assessment. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).

[5] The GAF Scale is used by mental health professionals to rate overall functioning and considers the psychological, social, and occupational functioning of an individual on a hypothetical continuum of 1 to 100. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Rev.2000) (DSM IV ), with 100 being the most high-functioning. A score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. DSM IV.

4

requested a referral to a psychiatrist because her psychiatric medication needs were becoming increasingly complicated. R. 830. Prim returned to Graham for a counseling session in April 2010, and discussed her daily stress. R. 824.

On December 4, 2011, Prim visited her treating physician for fibromyalgia pain and reported feeling depressed, crying three to four times a week, and anhedonia. R. 1216. Her physician noted "[y]ou HAVE to get your mood better. I am going to start you on Prozac 20 mg daily." R. 1217. On December 14, 2011, Prim reported that her mood was good, she was crying less and had no anhedonia. R. 1222.

Prim did not return to counseling until July 2011. R. 890–92. At that time, Prim stated that her symptoms returned because she could not take her medications while pregnant. R. 890. Prim reported a depressed mood, anhedonia, sleep problems, inappropriate guilt, fatigue and loss of energy. R. 890. Prim once again denied any problem with crowds or being in public. R. 890. Graham recommended that Prim attend an anxiety and depression group and continue counseling. R. 892. Prim did not attend the anxiety and depression group (R. 898), and did not follow up with regular counseling or seek psychiatric treatment.

Prim returned to see Graham on January 24, 2012, having recently given birth to her third child. R. 881. Prim reported that she and her third baby were doing fine. Id. She started classes at a community college and reported feeling overwhelmed and having panic attacks. Id. Graham discussed with Prim her lack of motivation for coming in for therapy, and the need to set boundaries. R. 882. Prim returned on February 15, 2012, and reported feeling overwhelmed by taking a full case load at school and caring for her three children. R. 883. Prim noted that she would "love" to fly to visit her cousin in Miami for a week. R. 883. Prim did not return for further counseling.

5

Prim was evaluated by consultative examiner Pamela Tessnear, Ph.D., on August 16, 2012. R. 1274. Dr. Tessnear's diagnostic impressions were somatization disorder, major depressive disorder, moderate, and generalized anxiety disorder. R. 1281. Dr. Tessnear determined that Prim is able to understand and follow simple instructions, but cannot perform detailed tasks reliably because her focus is distracted by pain. R. 1282. Dr. Tessnear found that Prim is very self-conscious about being evaluated and that her performance suffers when she is being observed. R. 1283. She also found that Prim is anxious in groups of people and is better suited for work that involves superficial contact with few others. Id. Dr. Tessnear recommended that Prim see a counselor regularly to learn ways of dealing with depression and anxiety and resist her social isolation. Id.

Dr. Tessnear also completed a medical source statement, and found that Prim had moderate limitations in her ability to understand and remember detailed instructions, maintain concentration and attention for extended periods, and interact appropriately with supervisors and co-workers. R. 1284–285. Dr. Tessnear found that Prim had marked limitations with carrying out detailed instructions, working with or near others without being distracted by them and interacting appropriately with the public. Id.

The ALJ gave "some" weight to Dr. Tessnear's opinions overall, and specified that he was giving "limited" weight to Dr. Tessnear's finding that Prim has marked difficulties interacting with the public, finding that it did not correlate with Prim's testimony and activities of daily living. R. 22. However, the ALJ restricted Prim's RFC to simple, routine, easy-to-learn unskilled work activity with no interaction with the public and only superficial interaction with coworkers and supervisors. R. 17.

6

During the administrative hearing, the ALJ presented the vocational expert with a hypothetical individual who is limited to the restrictions included in the RFC— simple, easy to learn, repetitive, unskilled work activity, who should not interact with the public and only have superficial interaction with co-workers and supervisors. R. 56. The vocational expert testified that jobs existed for such an individual, such as a non-personal mail clerk, a production inspector and a hand packer. R. 57. Prim's attorney then asked the vocational expert whether his testimony would change if the ALJ's hypothetical included an individual who was severely limited in her ability to work with or near others without being distracted by them. R. 58–59. The vocational expert testified that the additional limitation would restrict the number of jobs available by at least 80 percent, but would not preclude all competitive work. R. 60.

Prim argues that the ALJ erred by failing to include a limitation in her ability to work with or near others without being distracted in the hypothetical question presented to the vocational expert. The purpose of a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). A vocational expert's opinion must be given in response to proper hypothetical questions, which fairly set out all of the claimant's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (quoting Walker, 889 F.2d at 50). The ALJ has "some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do." Fisher v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006). Hypothetical questions should adequately reflect the plaintiff's RFC as found by the ALJ and supported by sufficient evidence. Id. However, the ALJ is not required to accept the vocational expert's opinion for a hypothetical based on limitations that the ALJ did not include in the RFC.

7

I find that substantial evidence supports the ALJ's RFC determination for Prim's mental limitations, and the hypothetical given by the ALJ included all of the limitations assessed in the RFC. When making an RFC assessment, the ALJ must assess the medical opinions of record. 20 C.F.R. § 416.927. The regulations provide that the opinion of a consultative examiner like Dr. Tessnear should be given more weight than a medical source that has not examined the claimant. 20 C.F.R. § 416.927(c). However, the ALJ must weigh several factors when evaluating a consultative opinion, such as whether relevant medical evidence supports the opinion, how well explained the opinion is, how consistent the opinion is with the record as a whole, and whether the opinion is from a specialist in the relevant field. 20 C.F.R. § 416.927. Ultimately, the ALJ must consider the opinions received in light of the evidence of record and determine whether the record supports the opinions offered. While an examiner's opinion is generally accorded more weight than a non-examiner's opinion, if an "opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 385, 590) (4th Cir. 1996)).

The opinion testimony in the record relating to Prim's mental limitations consists of opinions from two state agency physicians who find that Prim's depression and anxiety are not severe, and Dr. Tessnear's report. R. 89, 100, 1274. Dr. Tessnear's written report notes that Prim is self-conscious about being evaluated and her performance suffers when she is being observed. Dr. Tessnear also found that Prim is quite anxious in groups of people and is better suited for work that involves superficial contact with few others. R. 1283. The ALJ was not required to fully adopt all of the restrictions set forth in Dr. Tessnear's opinion, but rather was tasked with

8

weighing the opinion against the record as a whole. The ALJ properly reviewed Dr. Tessnear's determinations and gave her opinion some weight. The ALJ noted that Prim reported more severe symptoms to Dr. Tessnear, who she was seeing for disability qualification, than to her treating physicians, who she saw for treatment. R. 22. The ALJ also gave some weight to the opinions of state agency physicians Howard Leizer, Ph.D. and Jeanne Buyck, Ph.D., who concluded that Prim's mental impairments were not severe. R. 24, 89, 100.

Prim's treatment records reflect mild symptoms of depression and anxiety. Prim's treatment history reflects intermittent complaints of depression, anxiety and anhedonia. Prim rarely sought counseling for her condition, or attended follow up and other recommended appointments. The focus of Prim's few counseling sessions were finding ways to handle the daily stress of raising children and taking college classes. R. 824, 828, 881–83, 892. Additionally, Prim's records reflect that her symptoms of depression and anxiety were alleviated with medication. R. 800, 1222. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

Dr. Tessnear's findings are also contradicted by Prim's reported daily activities. Prim repeatedly denied any problem with crowds or being in public. R. 828, 890. As late as 2012, Prim reported engaging in daily activities including caring for her three children and taking a full caseload of online college courses. R. 881, 883. Additionally, Prim expressed a desire to fly to Miami to visit a relative for a week. R. 883. Prim's treatment records do not support the alleged severity of her difficulty interacting with others.

The ALJ generally accepted Dr. Tessnear's opinion, but found that this opinion and the medical record did not support a finding of disability. The ALJ adopted the majority of Dr. Tessnear's limitations in the RFC, and specifically accounted for Prim's difficulty working with

9

or near others by limiting her to superficial interaction with co-workers and supervisors, and restricting her to simple, unskilled, repetitive, easy-to-learn work.  This analysis reflects reasoned consideration of the medical opinions in relation to the entire record.  The RFC properly accounted for all of Prim's mental limitations established by the medical evidence. Specifically, a limitation of superficial interaction with co-workers and supervisors, combined with simple, easy to learn, repetitive, unskilled work activity, sufficiently accommodates Prim's difficulty working with or near others without being distracted by them. R. 1284.  See Cox v. Astrue, No. CIV.A.09-1334, 2010 WL 1976871, at *10 (W.D. Pa. May 17, 2010) ("The ALJ addressed Cox's susceptibility to being distracted by others by eliminating positions 'involving close interaction with co-workers, the general public, or supervisors.'").

Accordingly, I find no error in the ALJ's analysis and find that substantial evidence supports the ALJ's evaluation of the medical opinions of record and RFC.   Thus, I conclude that the hypothetical given to the vocational expert adequately accounted for all impairments reflected in the record.

**Need for Frequent Breaks**

Prim also argues that the ALJ improperly rejected the opinion of her treating urologist, Eric Gwynn, M.D., in determining Prim's RFC.  Specifically, Dr. Gwynn found that Prim would need an unscheduled bathroom break once and hour, which the vocational expert testified would preclude competitive employment. R. 55, 1087.  The ALJ gave Dr. Gwynn's opinion some weight, but rejected his opinion regarding the frequency of needed bathroom breaks. R. 22.  The ALJ found that Prim's reported activities of daily living and objective medical evidence did not support this limitation.  The ALJ's conclusion is supported by substantial evidence.

10

On October 11, 2010, Prim visited Ralph Brown, Jr., M.D. for abdominal pain. R. 860. In the course of his physical exam, Dr. Brown noted "Genitourinary: Denies pain, incontinence, hematuria, stones, weak stream, difficulty urinating, waking > 1 time to void, voiding > 6 times per day, bladder cancer." R. 860. Prim continued to seek treatment with Dr. Brown through 2012, and his notes consistently reflect that Prim denied urinating more than 6 times per day. See R. 1206 (9/2011), 1255 (3/2012).

Prim also visited Carilion Clinic Gastroenterology from April 2010 through April 2012 for gasteoparesis and abdominal pain. The records reflect that Prim complained of urinary frequency twice during her visits; in October and November 2011. R. 895, 907. The remainder of Prim's treatment notes from Carilion Clinic Gastroenterology reflect that Prim was negative for dysuria, urgency, frequency, hematuria and flank pain. See R. 837 (4/2010), 846 (11/2010), 1020 (4/2012).

Prim began treatment with urologist Dr. Gwynn on October 1, 2010, for chronic pelvic pain and voiding symptoms. R. 1069. She complained of progressively worsening lower abdominal pain since 2008 and recurrent urinary tract infections. She reported nocturia[6] three to four times a night but denied incontinence or frequency. Notably, Prim reported drinking four to six two liters of Coke per day, with tea in between. R. 1069. Dr. Gwynn diagnosed interstitial cystitis, polycystic kidney disease and depression. R. 1070. He recommended that Prim decrease her caffeine intake tremendously, and prescribed an IC diet and cystoscopic evaluation. R. 1070.

On January 7, 2011, Dr. Gwynn noted that Prim's cystoscopic evaluation was positive for IC and that after the procedure she was doing "somewhat better." R. 1065. Dr. Gwynn noted that Prim continues to have frequent nighttime urination with some suprapubic pain during

---

[6] Nocturia is the need to wake up and urinate at night. See http://www.nlm.nih.gov/medlineplus/ency/article/003141.htm.

11

voiding. Prim also reported that she was currently six weeks pregnant. R. 1065. Dr. Gwynn recommended avoiding spicy foods and caffeine, and proceeding with medication for IC. R. 1065.

Prim returned to Dr. Gwynn on November 3, 2011, three months after having her third child. Prim noted that her symptoms were worse and complained of daytime frequency and of getting up more than 6 times per night to urinate. R. 1047. She also reported drinking two twenty ounce sodas per day. R. 1048. Prim completed a patient assessment questionnaire and reported using the bathroom 15–19 times a day. R. 1064. Jill Bloom, PA-C, prescribed Vesicare, a medication for frequency and nocturia. R. 1049.

Prim returned on February 24, 2012, and again complained of daytime urinary frequency and nocturia, as well as chronic pelvic pain and dyspareunia. R. 1042. She noted that the Vesicare helped decrease her frequency, but that it was not covered by her insurance. She stated that the alternative drug, Ditropan, caused her to vomit, so she could only take it at night. R. 1042.

Dr. Gwynn completed a medical source statement on May 14, 2012. When asked to estimate how frequently Prim must urinate, Dr. Gwynn wrote, "unsure- need to ask p[atien]t." R. 1086. Dr. Gwynn noted that Prim needs a job that permits ready access to a restroom, and when asked how often she will need unscheduled restroom breaks, wrote "once an hour?" for 5 minutes a time with very little advance notice. R. 1087. Dr. Gwynn further noted that Prim's symptoms would never interfere with her concentration and attention such that she was off task, and would never require that she miss work. R. 1087. On May 23, 2012, Dr. Gwynn completed a medical source statement, and responded affirmatively to the question"[r]ecognizing that impairments may affect individuals differently, please state whether 15 to 18 unscheduled

12

bathroom breaks during a day are reasonably consistent with Ms. Prim's medical signs and findings." R. 1090.

The ALJ gave Dr. Gwynn's opinion some weight, aside from the statement pertaining to frequent bathroom breaks. R. 22. The ALJ found this opinion unsupported by other medical records where Prim denied urinary frequency, as well as her reported daily activities. R. 22. Prim asserts that the ALJ's conclusion is not supported by substantial evidence because the ALJ erroneously attributes medical records to the wrong physician and misconstrues the evidence of Prim's ability to perform daily activities.[7] Prim also disputes the relevance of the ALJ's statement that there is little evidence that Prim wears Depends or takes changes of clothes with her in case of an accident. R. 23.

A treating physician's opinion is not automatically entitled to controlling weight. Treating physicians' opinions are given controlling weight only if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); Saul v. Astrue, Civ. Action No. 2:09-cv-1008, 2011 WL 1229781 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5). "None of these

---

[7] Prim notes that the ALJ mistakenly attributes certain medical records to family practitioner Chad Thompson, M.D. rather than Dr. Gwynn. Having reviewed the record as a whole, I find that any mistakes in the ALJ's recitation of Prim's medical history are harmless and do not deprive the decision of substantial evidence.

13

factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010).

Having reviewed the records, substantial evidence supports the ALJ's decision to reject Dr. Gwynn's opinion that Prim requires a bathroom break once an hour. The medical records indicate that Prim's complaints of urinary frequency were limited to a narrow time frame. Prim consistently denied urinary frequency until January 2011, at which time she was six weeks pregnant. Prim continued to complain of frequency in November 2011, when she visited Dr. Gwynn a few months after birthing her third child. The questionnaire completed by Prim stating that she used the bathroom 15–19 times a day, and relied upon for Dr. Gwynn's second medical source statement, was also dated November 2011. Likewise, Prim's complaints of frequency to Carilion Clinic Gastroenterology occurred during the same time frame, October and November 2011. Prim's last complaint of frequency was a few months later, in February 2012. R. 1042. The evidence does not indicate that Prim was suffering from frequency either prior to or after that time period. During her February 24, 2012 visit, Prim noted that medication helped decrease her frequency, but it was not covered by her insurance. R. 1042. As noted above, if a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d at 1166.

Although Prim complained of frequency from January 2011 through February 2012, the treatment notes do not support a finding that Prim required bathroom breaks once an hour. Additionally, Prim failed to follow the consistent recommendation of her treatment providers that she reduce or eliminate caffeine from her diet. R. 1042, 1048, 1070. Indeed, on February 24, 2012, she reported drinking more caffeine because she was taking finals for college. R. 1042.

14

Furthermore, Dr. Gwynn's notations in his reports invite speculation as to Prim's need for bathroom breaks. When initially asked to estimate how frequently Prim must urinate, Dr. Gwynn wrote, "unsure- need to ask p[atien]t." R. 1086. Dr. Gwynn's second note regarding Prim's need for unscheduled bathroom breaks was also far from definitive, stating, "once an hour?" R. 1087. Prim's third attempt at securing Dr. Gwynn's opinion on this point was an interrogatory reciting Prim's statement that she needed 15 to 19 bathroom breaks a day, and asking Dr. Gwynn if such was "reasonably consistent with [her] medical signs and findings." R. 1090. Dr. Gwynn agreed that Prim's testimony was consistent with her medical records.

Considering Dr. Gwynn's hesitancy to declare how frequently Prim must use the bathroom, coupled with Prim's limited complaints of urinary frequency and failure to follow the recommended treatment, I find substantial evidence to support the ALJ's conclusion that the objective medical records do not support the conclusion that Prim must have an unscheduled bathroom break once an hour and is thus precluded from all competitive employment.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Glen E. Conrad, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period

15

prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

                              Enter: July 22, 2015

                              *Robert S. Ballou*

                              Robert S. Ballou
                              United States Magistrate Judge